Mr. Adams, you have reserved 5 minutes for rebuttal, you are familiar with the light system? Are you familiar with our light system? Are you familiar with our light system, our light system? You may begin any time. May I please report, Charles Adams for the appellate marshal. Today's evening proceeding is one hopes the final chapter in the 22 year history of this litigation. To the marshals, the jury has seen the chapter asked. I'm not going to detail everything that's in the brief. Time doesn't allow, I presume we have the briefs and written record. What I want to do this morning is highlight 5 discrete points that are issued in the appeal. I'd like to begin with Tinsley and the central argument that the fees in this case were completely denied by the VCA for an issue that was actually litigated. May I ask a question regarding the lobbying fees that has been referenced? The government complains that certain of the fees were incurred lobbying their client. For example, discussions with the new contracting officer and then the regional director of the Bureau of Reclamation. Rule 4.2 of the ABA model rule for professional conduct prohibits opposing counsel contacting clients without counsel's permission. Why were your actions not a violation of that rule? This point, your honor, was newly raised to me. The context of my hearing the record for this was that the client himself, the marshals, frustrated with hearing anything at all from the Bureau of Attorney's. And our counsel, Dr. John Duklanski, had asked for some of the files to be in with the solicitor's office. He becomes frustrated that he's hearing nothing at all. So the client engages the then already Senator Packwood and tries to open conversations in the interior to try to get an administrative hearing within the agency under what they call a management review to have the agency decide whether or not the contracting officer in this case acted appropriately in the manner in which he had faulted the marshal. Those were the contacts, and that's what's described as lobbying in the benefits brief. The board didn't award those fees because the board concluded they were not incurred in the litigation before the board and not reasonable and necessary. That's correct. Well, they decided they were not before the board. In doing so, the board requires that fees be paid to a contractor incurred in connection with the proceeding. In this instance, in 1989- The standard is abuse of discretion. How is that an abuse of discretion? In 1989 and 1990, Judge Packwood directed the parties to settle. Judge Packwood? Judge Packwood, not Senator Packwood. Right. Judge Packwood of the BCA put this case in a suspense status. He said to the parties, the settlement was a good idea before, referring to the earlier fight for settlement, which I'll talk about in a minute. He said you should go try and settle now. So Packwood himself, solis ponte, said I'm dismissing these cases without prejudice. I want the parties to go off and try to settle this. And he did it in 1989 and he did it in 1990. And in that same order, Packwood also said, because we don't have a suspense docket, what I'm doing here is dismissing these cases without prejudice. Go off and try to settle them. If you're unable to settle them despite all your best efforts, then you can reinstate this case. Provided you're within the statute of limitations. That's not what the court said. The court's direction was go try to settle this- Without consideration of the statute of limitations? At the time, Your Honor, I'm trying to remember my CDA time limits, that issue has never been raised. It's never been raised. Packwood did what he did. Packwood put the case in the suspense status. He said, when you are done trying to settle, only then, only if after that you create discovery, only then do you come back to us. Another issue in government brief related to this is Packwood does not say, he never said, it's not in the record anywhere. In fact, the record is to the contrary. Packwood never said, I want you to schedule an immediate hearing on the merits. To the contrary. Well, let me ask you, I'm missing something in the facts. Let's assume we reject the argument that you've made thus far. In other words, fees for these outside, what's called lobbying. It seemed to me in the brief, you were at least suggesting, and I was a little confused by this, that even if you do that, there's some chunk of money left that constitute, that was really actual litigation. Absolutely. But I don't, could you just tell me just generally, one, were those fees that you call actual litigation, were they pre-1990 or pre-1989, in connection with trying to pursue the alternative theory? There are two, settlement gets confusing again, because there are two, that term is used in two very different contexts. Right. The lobbying fees, we've talked about that. Let's take that off the table. Completely different issue. In 85, the parties met, the then contracting officer reached an agreement to settle. Right, no, I'm, okay, I don't want to. And you say that you incurred expenses that were rejected by the board here as, under the rubric of lobbying expenses, that constituted actual litigation fees pre-89 on that alternative theory? Yes, Your Honor, and fees incurred after that. Well, let's take that, okay. So are the fees that you're now contesting, under the lobbying expenses, not lobbying, were they incurred pre- or post-1989? The fees incurred in litigating the FIFA settlement issue were incurred in two periods. They were incurred up to 89-90, when Packard said, well, I'm going to try to settle this case. Right, right. The case then gets reinstated in 1991 by Judge Rohn, who finds that Packard abused his discretion, or error in dismissing the case to failure to prosecute. She then tried, and a hearing was held, evidence was taken, and she then tried the issue of whether there had been an earlier settlement reached with Contracting Officer FIFA, actually litigated in front of Judge Rohn. In 1998, Judge Rohn issued an opinion saying, I disagree with Marshall. I, Judge Rohn, find that she did not, that there was not an enforceable settlement with Contracting Officer FIFA. So now, it's time, Judge Rohn says, for you to try your alternate theories, your other theories for why this termination for convenience, why the default should be converted to termination for convenience. And that issue then, to FIFA, which I want to quote to the court. I'm still, so can you just, I'm not missing, the fees that are in dispute here, the actual litigation, so they were incurred between 1991 and 1998? No, they were incurred from 1985 through and continuing, 1998, when the case was then actually finally tried on whether or not a settlement had been reached with FIFA. So you were denied any litigation expenses from 1985 to 1989? Every single penny incurred in litigating, actually trying the FIFA settlement claim was denied. Every penny. Which brings me to Hanson. That time period then, let's focus on that a little bit, because I'm still confused. Between 1985 and 1989, this is when you were trying to settle? No, no. There had already been a settlement. The original settlement? The original settlement. What was happening in that window of 1985 to 1999 was moving the case towards trying that issue. Marshall wanted to leave with the trial of that issue because it would be the least expensive alternative theory to convert for convenience. So in that period, the case was moving towards that. During a conference phone call in 1987, I believe it was, then-Judge Patlick said, I've been thinking about this, and I've decided that there wasn't enough here to enforce the settlement with FIFA. That set in motion the next three or four years to try to get the case off that dime. Because again, Marshall had bankrupted. They were trying to find a way to get this thing converted to convenience. The least expensive way to do that was to try the FIFA settlement. That trial didn't happen. Did the board state the reason for not awarding fees based on the FIFA claim? In its opinion, no. In its earlier correspondence with counsel, you betcha. In a letter from the court to Marshall, they said, I am going to award you nothing for fees you've incurred on your unsuccessful claim. Now, the way I read the record is that the board did not award fees for the FIFA claim because the board thought that the fees were not reasonably incurred and had caused Marshall to substantially delay the litigation by spending 12 years pursuing a claim that was not meritorious because the contracting officer never had authority to settle. Which brings us back then to Henson, and if I'm at a place from Henson. 461 U.S. at 435. I'm going to quote two sentences out of Henson. These are the core of why this case was wrongly decided and why every dime that was spent in litigating the FIFA settlement is due to be paid. Why did you spend 12 years litigating a claim where the officer did not have authority to settle? 12 years is exceedingly a long period of time. I agree, and I direct the court to both our opening reply brief and the torture 12-year history and how it came to be not until 1998 it got tried. If I may again back to Hensley and I quote, litigants in good faith. There's no finding in this record anywhere that Marshall acted in anything other than good faith to the contrary in 1994. Judge Rome, in reinstating this case, found that it acted good faith. Now back to the quote. Litigants in good faith may raise alternative legal grounds for desired outcome, and the court's rejection of a certain ground is not sufficient reason for reducing the fee. The result is what matters. The Marshals got the result they wanted after two decades of Well, it seems to me even applying Hensley there's some basis for cutting it off in 1989. It seems to me pre-1989 one could argue it was kind of a Hensley alternative theory case. But it seems to me it's much harder to do that after 1989 because the board made clear that this was a waste of time to pursue this and under our abuse of discussion review the board could have reasonably said that those fees were unreasonable. So is there real money? Are we talking about anything real? If we cut it off in 1989, do you have enough on the record to establish that there were fees that occurred in actual litigation? Absolutely. And what portion? We're all talking about like $150,000 here, right? No. When you add up each of the various claims, you're talking far more than that. 81% of the dollar claim, whether you measure it by 75 or 125, is for fees incurred in actually litigating the claims. What about if you cut it off at 1989? How much of that was pre or post-1989? I don't have that figure at my fingertips. It's in the record. The record would show because it's chronological. It shows when the fees are. I want to remind the court, though, that in 1998, Judge Rome, who reinstated this litigation in 1994, tried the Michael Sullivan claim. She heard the arguments for the first time. For the first time, a judge sat down, went through the evidence on both sides, and she ultimately concluded that she disagreed with the marshals. She ultimately concluded that that ground for awarding the fees was not persuasive. She found the contracting officer didn't have authority. She didn't say, I don't have to go there because of what Judge Backwood did in 1989 or 1990. She reinstated the case. She tried the theory. Not a whisper out of her anywhere about abuse of discretion. To the contrary, she found in 1994 that marshals had not engaged in bad faith and, in fact, had acted in pursuing the various ways and specifically enforcing the Michael Sullivan as a way to convert for convenience. Mr. Adam, you're well on your rebuttal time, but we'll restore two minutes, three minutes, let's see, four minutes of your rebuttal time. I will stop there, Your Honor. I think the other points I wanted to raise are adequately addressed in the brief. Thank you very much. Mr. Smith? Thank you. Give Mr. Smith an additional two minutes if he needs it. Thank you, Your Honor. Mr. Smith, please. The court, the government's position was quite accurately stated in your dialogue with my opponent. That is that the pursuit of the 5-4 claim, be it lobbying or litigation, were properly excluded by the court, and that is our position here. Hensley Was that pre-1989 expenses and fees? Yes. Or is that post-1989? They received all of their fees and expenses from 1989 forward? No. It's from 1998 forward. 1998 is when Judge Rohn finally, officially, and for the last time, rejected the 5-4 claim, and the case essentially shifted to whatever you want to call it, the merits, the defective spec portion of the claim being properly excluded. Oh, that's when it shifted to a termination for convenience at that point. Yes. Essentially, that is when the FIFO issue died, and the rest of the case went forward on, again, to use the term merits. And that is why, according to Hensley But in order to get to the merits, they had to spend a lot of time on a lot of nebulous areas that were probably required in order to focus the government's attention on a real issue, wasn't it? The real issue not being the FIFO settlement, the real issue being the merits of the claim, whether there were defective specs, whether they impeded the claim's performance during the contract, whether the contracting officer properly terminated the contract or default. Those are the issues that essentially took over after the FIFO settlement matter was finally litigated, from 1998 all the way up to the final conclusion, which then led to the Egypt petition. What about in preparation before 1998? Well, that is the line that the board drew, and there was submissions back and forth about what dollars were spent when, and the board found that approximately half of the dollars were spent in pursuit of the FIFO claim and the other half in pursuit of the meritorious claims, and that's why $962,000 were awarded by the board here. What's the stated reason by the board for denying the FIFO claim? That it was not reasonably related to the successful litigation of the case. In the board's opinion? Yes. Page 6 of the board's opinion, and then repeat it again at page 9. The idea being, again, that the board differentiated between both FIFO efforts and non-FIFO efforts and I believe commended the government to use the word generously for agreeing to the $962,000 that was in fact awarded by the board. The reason that that's correct, and frankly, this is why I'm glad we're here, because I don't think it's emphasized, frankly, either in the opinion or in our brief, is because Hensley specifically talks about the matter of whether the claims are related or not, and that if you have If there are factually separate claims that are not successful, then that is a basis for reducing the fee, and that's exactly what happened here. But this claim, let me see if I'm understanding this case. I mean, if they had prevailed on the alternative theory on the FIFO issue, it would have resolved the entire case, right? We would not have had to pursue the other one. Why are these not general alternative theories? I'm having a hard time finding out why, if we're talking about litigation expenses, not the lobbying stuff, but if we're talking about litigation, I'm having a hard time, frankly, saying that Hensley doesn't apply. I mean, there were two bases in which they alleged that they should get relief from the government. They pursued one of them. They lost one. It's a different legal theory upon which they wouldn't. Why is that not Hensley? Because, well, and that's a very important point, and that is in fact what the Hensley opinion spends a lot of time talking about. It first says if you have factually unrelated claims and one of them is unsuccessful, you do not get fees for that. And that it is not simply based on that. But are these two alternative theories? I mean, the government owes us something. Right. You can reach that result under a theory that they had the settlement stuff, or you can reach it under the theory that they ultimately did. Yes, that's true. Yeah? And so the point is, and frankly, I think we can get balled up in the term alternative theories. I agree that they are, quote, alternative theories. But Hensley explains specifically that doesn't end it. You look at the success and the factual relationship between those alternative theories. And if there is, I have the words here. For the plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee. The FIFO settlement is factually distinct from the merits of the claim. If one involves contracting officer's discretion and whether an agreement was reached and things like that, that is entirely separate from whether the plaintiff suffered from defective specs during the performance of the contract, or whether the contract was terminated for default property. But aren't they incorporated one into the other? Isn't it really the same type of evidence that would be submitted for both? Not at all. You could have a settlement of a claim that doesn't have anything to do with whether it's a defective specification claim or whether you're overturning the termination for default or anything. As has been discussed at great length, frankly, in the record, the issue was whether the contracting officer had authority and whether, in fact, a settlement was reached. That is an entirely factually different issue. Well, let me ask you. I know you're not a patent person necessarily. We do a lot of patent cases here. Definitely not. And so if you know anything about patent law, I mean, let's assume we've got, and let's assume EGIF would apply here as well, or Hensley would apply at least. If you've got an invalidity claim, I mean, you're an alleged infringer, and you want to prevail. You want to get out of this. You allege, one, that you're not infringing, or alternatively, that the patent is invalid. Would you say under Hensley that if you win on one of those theories, you can get litigation, EGIF fees, for your litigation of both of those? Infringing versus invalid. Those do sound like factually distinct claims. So you would say that under your theory, you couldn't get both. Exactly, yeah. Are there any, I mean, do you cite all the cases that are current on that issue in the brief? Well, frankly, as well. That's why I started by saying I want to focus on something that, frankly, I'll say this. I did not focus on it as well as I should have in the brief. It is Hensley, though. I read the whole thing cover to cover yesterday. Yeah, but the question is if there's any ambiguity in exactly how Hensley applies, then it would be helpful to see what other. I agree with that. And frankly, I don't think there is ambiguity. I think it's patently clear that the inquiry starts with were they successful at all? Were they the prevailing party? And then it talks about do you have related claims or not. And only if you have related claims do you then get into the whole point of alternative theories. And frankly, I agree with that point. If you have a, again, I do contract law, so if you have a different site condition claim and a defective specification claim, those are often going to involve interrelated facts. And if you prevail on the different site condition claim but not the defective spec claim, that is not a reason to produce the fee. But you may go, but if you're pursuing one claim, you may be asking for expenses for 14 things, which you ultimately lose, but you would still get the bulk of those, right? I mean, that's a prevailing party question. Well, as long as they are related. And again, that's what Hensley was about. Hensley was a lot like what I just said. Let me ask you, just to move on, just on the questions we pursued on the other side, is assuming we were to disagree with you on the Hensley parsing, does the government still feel that even if we were to award, think that fees would have been reasonable, that there should be a board concluded that that alternative theory was not meritorious? Yeah. Well, and I think you talked about it with Mr. Adams here. It was 1987 that they were advised, albeit informally in a status conference, but essentially Marshall and his lawyers were hold since 1987 by the Ponderer family. But what about his answer, which is that, well, Judge Rome kind of said, well, today there's still live issues. Why isn't that responsible? Well, the judge did not do that spontaneously. Marshall kept pursuing that claim from 1987 all the way through the trial of that matter that certainly did, in fact, happen. But the board allowed a trial to go forward on that. That's true. But it wasn't that the board said, you know, oh, we have an unresolved issue here that we want to resolve about the Fife settlement. It was continually pressed year after year by Marshall. Well, and frankly, that is the problem. That's why we have such a long period of time and why we have an exclusion of fees. I'm still trying to focus on your Fife claim. Is the government saying that the fees incurred in pursuing the Fife claim was so lacking of merit that the judge or the board did not abuse its discretion in not awarding those fees? Is that your claim? The board definitely did not abuse its discretion in not awarding those fees. Well, right. I want to be careful about that. The board did not find that it was so lacking of merit. And I know that is a standard. And Andreeja has talked about it intensely. And there's another standard of it is where the plaintiff unduly or unreasonably prolongs the litigation, the fees will be reduced as well. And frankly, I don't think the board explicitly found that either. Can that be inferred from the record that the board concluded that it was so lacking of merit caused such a delay that the fees were not reasonably incurred and therefore should not be performed? Absolutely that. Because, again, we have 1987. In the oral hearing, we have 1989 in a written form. And then finally, we have 1998 in a formal opinion. And all of that time in between, again, it's a Byzantine record of meetings and efforts of the board to try to get somebody to enforce this bifurcate on it that it did not have merit. This is a 22-year litigation. Yes. So, well, exactly. So, again, that is all true. Hensley provides a clear dividing line. And by applying the Hensley test that I've been talking about, that is the unrelated claim test, you don't have to even worry about lobbying versus litigation money. It's all by fault. And if it's related to by fault, it's not recoverable. If it's related to other things, it is. But there was also some board requirement that they go back and try to settle it, too, wasn't it? Was it their administrative law judge requesting them to go back and try to settle the case? I mean, that's not a delay on Marshall's part. They tried to settle it. Well, that was the 1989, I guess, I'm not sure what I'd call it, an interim order, a scheduling order, whatever you want to call it. It was the one that said there is no viable settlement here, so I'm putting this case off. They don't have the suspense stock in, so they say we're dismissing it without prejudice, go forth and try to settle the case, do fact discovery. When you're done with that, you can reinstate the case if you don't settle it. And when you're ready to schedule an immediate hearing on the merits. So you really can't say that Marshall used excessive delay in the process there, at least they were trying to settle it, pursuant to? It wasn't very long since that order was issued in 1989 until the case did then get reinstated on the docket. I think the problem is that that wasn't the end of the FIFO issue. If in 1990 FIFO was dead and Marshall continued on with the merits of the case instead of another eight years of the FIFO issue, that would certainly reduce the amount of fees that Marshall incurred in the first place, and it would provide a different right line between FIFO and non-FIFO. The government and the board used 1998. If all of that had happened in 1989, that could have been used as well. I apologize if you've already covered this, but I think you referred to pages six and nine. What I'm interested in, it seems to me, I can't find where on this lobbying expense issue that we've been talking about on the Hensley issue, where the board really addressed that. It seemed to me, reading the board's opinion, that they talked about lobbying expenses, that they were really talking about the Senator Packwood stuff, and on that basis they denied the amount. I don't see anything where the board really applied the analysis that the government is applying here in terms of the actual litigation expense. I frankly agree. So there's no abuse of discretion or deference or whatever because it appears to us that the board didn't even address that issue, right? Well, I don't want to go that far. I would suggest that the term put in the use of the book, lobbying efforts, got overused, frankly, by both the government and the board. That is to describe fightful efforts. So with that correction, I think the board's opinion is fine. But it seems that their analysis, even if you think lobbying expenses was overused, the analysis they used was really for lobbying expenses. I mean, the only rationale they seemed to apply was that it wasn't related because they underlined before the forum it was in the wrong forum. So it seems that the board exclusively was talking about the true lobbying expenses, right? No question they did not like the true lobbying expenses. Okay, and no question that they really at least didn't address specifically the issue of what about the actual litigation expenses that you've addressed here that you think aren't covered under the theory of Hensley. That's true, and I think if I could rewrite the board's opinion for them or, frankly, be more clear in our brief, that, yeah, that we're talking about a factually unrelated claim that was pursued unsuccessfully for years, period, and that those all costs, whether they're called for lobbying or litigation, are not covered by Hensley or Don. So we really don't know what the board would have done and how the board would have answered that question, right? Well, frankly, I guess it's a matter of the board did say these are, and they were talking about all of them, were fees and expenses that were not incurred, quote, were... In the forum. Litigation before the board. Those are the words they used. Right, which suggests that they're talking about the true lobbying expenses and not the alternative theory. Yeah, right. Again, to be more precise, it should have been litigating of the successful claim before the board, and then it would be absolutely in harmony with what I'm saying when Hensley applies. That's the better way to write it. I don't think that makes it a reversible error, certainly, or an abuse of discretion, but that, I think, reading the opinion as a whole is clearly what the board meant. That is, they spent a lot of time... Well, it seems to me that the board just didn't deal with this question, which is reasonable. I mean, that's up to the parties to bring their arguments forward. I don't see anything here that suggests that the board really dealt with the particular question we've been dealing with here most of the morning. I will not disagree with that. I can cite to the record that at appendix page 67, the government said, basically, the reclamation position is that the appellant's recoverable fees and expenses should be limited to those incurred for the appellant's success, all the merits of its appeal, not for its unsuccessful efforts at arguing that the contracting officer had authority and did, in fact, convert determination for default to determination for convenience. These two periods of time are reasonably separate from one another, the time division occurring after Judge Rohn ruled on March 9th, 1998. So that is at least what the government said to the board. We can all read what the board did with that, and I can't argue either way. Thank you. Thank you, Mr. Smith. Mr. Adams, you have four minutes. I'm sorry, how much time? Four minutes. Two points quickly, and then I'll take only the four minutes. Hensley establishes two distinct forms of defining related claims, two distinct forms. One is, and we'll be familiar to anyone familiar with the Federal Rules of Civil Procedure, where you have a common core of related facts, factually based claims. An entirely separate category of related claims goes back to the language I quoted to the court earlier, and I will again quote this first sentence, livings in good faith may raise alternative legal grounds for a desired outcome. That's precisely what the attempt to enforce the Fayetteville Settlement was. It was an alternative legal ground for the desired outcome of compelling a conversion for convenience. Could you have recovered under both theories, or is one exclusive of the other? They are exclusive in the sense that the facts don't overlap 100%. That's true. I agree with Mr. Smith on that one. But there is some overlap. There's some overlap. And again, under Hensley, alternative legal theories producing the same outcome is related every bit as much as claims based on a common core of facts. This case is in that second category. Again, alternative legal grounds for a desired outcome. That desired outcome was convenience termination. You can pursue alternative legal theories, but you can't pursue theories that lack merit. Agreed? Agreed. And if we look at the Board's decision here and extrapolate, my concern is that the Board did not state in the record the reasons, the precise reasons for excluding the fivefold category of fees. But what I can conclude if I extrapolate is that the Board thought that that theory delayed the case substantially and was not meritorious. Two problems with that. The first is the standard under Hensley is you get the fees if you litigate in good faith. This record contains nowhere any indication that Marshall acted in anything other than good faith in trying to enforce the settlement by seal of fivefold. To the contrary, Judge Rohn, when she reinstated this case in 1994, found they had been acting in good faith. And in 1998, more to the point, on a connection with Goliath, in 1998, Judge Rohn dismissed on the merits the government's affirmative defense of Goliath, an affirmative defense of Goliath. On the merits, Judge Rohn said, and she's talking now about her 1994 reinstatement of this case, as the Board recognized in its 1994 decision granting reconsideration of its dismissal, Marshall has been pursuing its challenge to the default termination of its contract in lieu for one another since 1985. And Judge Rohn concluded, and I quote, Accordingly, we conclude that E.O.R. cannot prove its first affirmative defense of the Latchis. Race judicata, collateral estoppel, law of the case, whatever you want to use, as a matter of that judge's ruling, that's a dead issue. If the Court has no more questions. Thank you. Thank you, Mr. Adams.